All right, you may begin. May it please the court, Douglas Watts appearing on behalf of the appellant Robert Levy. It's my client's and my great honor to to have the opportunity to argue this case to this body. This was a case in which, as the court knows, there were proceedings in the district court that resulted in a partial grant of summary adjudication on behalf of the defendant and then rested his case. The court granted a rule 50 motion, a spoken motion for directed verdict, and then thereafter issued a statement of decision. And so the the primary question that the court has to determine at this point is whether that was an error, which plaintiff contends, Mr. Levy contends that it was, to essentially remove the case from the jury. The case in chief allow a reasonable jury to conclude that there was a sufficient authority, policymaking authority, on behalf of Ms. Knorr, who was the county administrative officer for Alpine County. Once the court makes that determination, then we can, I can go into point 1a, which will get us to all of plaintiff's points on appeal. Well, there's the, in the appellant's excerpts of record there, we can start. The court, and let me just say, the trial court could have gotten to that decision in multiple ways. The first and most obvious way is to look at the ordinance that created the position that Ms. Knorr held in 2007. That's an extraordinary document and it spells out the the fact that the board of this small county needed somebody like Ms. Knorr to be the boss and to run the county and make recommendations to the, to the board. I don't think the ordinance says anything about running the county, does it? Well, Your Honor, under section 2, administrative head of county, which is page 20. Section 2 what? I'm sorry, section 2. Go ahead. Administrative head of the county. Yeah. There is very telling  head of the county government under the direction and control of the board of supervisors. Under the control of the board. But there's a second clause there, Your Honor. Except as otherwise provided in this chapter. And that's, that's really where part of the, the main part of the problem here is, is when the court then goes down to the powers and duties under section 3, there is a litany of things that this person was charged to do, Ms. Knorr. Among them, policy formation, which is paragraph 3D. There is 3B, rather. I skipped past 3B. You say D, D is? D is in Delta, yes. Okay. But before that, 3B is in Bravo. Authority over employees of the county. This is a person that was statutorily vested with absolute authority over the county employees. Yeah, but it says authority to carry out the policies of the board of supervisors. That's her authority. Right. And so, okay. So who's the policymaker if she carries out the policies of the board of supervisors? Well, the facts that were adduced at trial, Your Honor, were that the way this worked, the county government worked, is that these people, these board members, served in a part-time position. Ms. Knorr was responsible for running this government. She would come to the members of the board and say, here are the things that we need to do. And more often than not, the vote on those things was pro forma. It was essentially a rubber stamp. And that becomes important when we get later into the record where there's this Liebert Cassidy Whitmore investigation that my client deemed to be and felt and had evidence to support was retaliatory in nature. So there's, I've gotten a little bit ahead of myself, there's 3J of these enumerated duties that Ms. Knorr had, which is investigations and complaints. There is no language limiting under 3J Ms. Knorr's ability to launch an investigation that she deemed she wanted to do. And that's exactly what plaintiff's evidence was in this case that was submitted to the jury last year. Chief among those... Well, but she can make investigations, but, you know, if the investigation finds something wrong, it doesn't tell us she has the authority to fix it, does it? No. It says she can investigate. It doesn't, it absolutely does not. Investigating is not making policy, you know, just like the, just like the, you know, the Judiciary Committee staff has authority to investigate on behalf of the committee. It doesn't make it policy decisions. Okay. Right? I don't see how that provision at all helps your case, because you can make an investigation. Well, because... Aside from the policymaker hurdle, I guess I'm just trying to figure out what was Mr. Levy deterred from saying? How, can you... Sure, sure, that to piece together for the timeline that we presented, both in the opposition to the summary judgment in 2016 and at trial, was that there was a policy stated as such verbally by Ms. Knorr, and it was witnessed by a person whose deposition was taken, Mr. Hartnett, that there, Ms. Knorr's job was to create a younger, cheaper workforce for Alpine County. Now, that, that happened obviously sometime prior to the events leading up to this investigation. Did you say that's in a policy? That was not a written policy. It was a spoken policy that Ms. Knorr enunciated in a board meeting at which Mr. Hartnett was present. That's in the, that's in the record. Mr. Hartnett was not, he was deposed. He did not testify at trial. His testimony was read into the record. So the, I lost my train of thought. So then, Mr. Levy, the evidence that we presented demonstrated that Mr. Levy and another witness, Beth Nunes, whose testimony and, and statements are included in the record, saw Ms. Knorr carry out this policy, targeting older workers, investigating them, harassing them, getting them to leave, or outright firing them. And Ms. Nunes herself was in her 60s toward the end of her employment, and she, in fact, testified that she felt she had the crosshairs on her. The evidence presented showed that Mr. Levy went to Chairman Veach, who was also deposed in this case and was a witness at trial, complained to him about this, said, hey, look at what's going on here. I'm over 40. Look how much money I get paid. And, and Mr. Veach discussed that with Ms. Knorr, and within a matter of days, if not weeks, Ms. Knorr had gone to Sheriff Crawford, who is my client's boss, and made oblique references to Mr. Levy possibly losing his pension if he was investigated for criminal activity. Also, there was the, the timing, as Ms. Nunes laid out, of the Liebert-Cassidy-Whitmore investigation. It was no more than two weeks after Ms. Nunes had a conversation with Ms. Knorr, wherein Ms. Knorr said, I'm going after Rob. And Ms. Nunes knew that Ms. Knorr could do that. Kennedy. I know, but the fact that she says she's doing that doesn't make it a county policy. O'Connor. It does not. I, I agree with Your Honor. There's no, there's nothing in the record where there's a, a written policy that, that states that, that Ms. Knorr can target people and, and go after them with an investigation in order to  Kennedy. Second ground, second ground that Judge Whaley relied on in granting the JMOL was that there was no adverse employment action anyway, right? O'Connor. That's correct. That was, that was not the basis of his decision, but it was sort of a gratuitous. Kennedy. That's sort of the fallback position. O'Connor. It was the fallback. It was, it was the JV position. And that was, I, I was starting this morning, but I, what I wanted to say. Kennedy. What was the, what was the adverse employment? O'Connor. The adverse employment action was, and it's contextual because this is a person who is in the field of law enforcement in a very, very small community with a website and a citizenry that knew everybody's business, particularly Mr. Levy's. This investigation and the report that, that was spawned by it had numerous references by name to Mr. Levy, attributions of dishonesty, attributions of falsifying documents and keeping... Kennedy. That's a different, that's a different claim. What are you saying? It was defamation? O'Connor. Well... Kennedy. Something like that? O'Connor. There was, this case started out with a state law defamation claim, which was disposed of by the court in the summary... Kennedy. That's encompassed by the defamation claim. O'Connor. Right. Kennedy. Is it? O'Connor. So that... O'Connor. Is the, absolutely the investigation... Kennedy. Is defaming him? O'Connor. Well, no... Kennedy. In an adverse employment action? O'Connor. It was, it was the fact that the investigation, because if, if particularly if the court looks at the Coase alter case, the Coase alter case is very articulate in that it, it talks about this idea that there doesn't need to be a grand procession down Main Street when there's going to be an adverse employment action. This is, though the court doesn't use the term contextual, you can read between the lines that it is. It is, it is not, something that is not de minimis and, and something like this in a small town, a small county where this sheriff, everybody knew his business and everybody read this report and Mr. Levy had planned to run for sheriff. He had planned to continue working in the telecommunications projects in which the county was working on and, and Sheriff Crawford testified in this case that he relieved Mr. Levy of, of some of those This court hears so many 1983 claims, particularly in the employment venue. This is not a cookie cutter retaliation claim in terms of the adverse employment action. But that, Your Honor, is what I would submit. You're also appealing from the summary judgment, right? Right. The, the, yes, the summary judgment adjudication motion is, is, is hopelessly odds with itself as I, to quote myself from my brief, it's basically a threadbare opinion because what the court spends the majority of her time doing is talking about evidentiary objections and then getting into this idea that Ms. Knorr was a policymaker for purposes of launching this investigation for purposes of possibly harming my client's reputation, which was our main theory of the case. That finding requires under the case law that there be an adverse, there had to be some evidence of an adverse employment action, which we put in our papers was, was the, the aftermath of the investigation, the impact on, on Mr. Levy. Then in the latter part of the opinion, the court just says, oh, by the way, there's no adverse employment action, so there goes his age discrimination, retaliation, and failure to prevent. And it's a, it's a, you put a lot of emphasis on this LCW report, but it looks like throughout the briefing and, and the record, the report is referred to as a personnel investigation, but into Mr. Levy, but it seems like the report is also focusing on this, so I'm just trying to figure out, you know, these budgetary concerns associated with the Public Works Project are important, so how could the board have gotten this investigation done in a way that Mr. Levy would not consider it retaliatory? Boy, that, that is a good question. One, I would have liked to have seen a jury that we had empaneled and had listened to this case, perhaps ultimately decide, if not in their verdict form, then perhaps in polling afterwards. The, the point, the point of Your Honor's question, and I absolutely get it, is that it is very prominent and has been from the beginning of this case that Alpine County, Pamela Knorr never had any animus toward Robert Levy. This is all just a big to-do about the fact that the county had financial issues and needed to look into the costs and, and things that were, that had to do with those, with those communications towers, and, and that is, of course, to be expected, I mean, if we ever get, if I ever get a case where a defendant says, you know, you're right, I did it because I was mad at Mr. Levy for complaining about age discrimination, it'll be the first time. So I, I believe that there was enough evidence in the record, particularly with the testimony of the witnesses, Mr. Levy himself, Chairman Veach, Ms. Nunes, that this was, this was about, this was something that Ms. Knorr knew she could do, she didn't have to go to the courts on Mr. Levy and get them to, and, and bear in mind, the record is clear that, that Mr. Veach testified that Ms. Knorr hired these people, committed the county to pay six figures for their fees, this Liebert Cassidy Whitmore firm, then had a meeting at which she told them she was doing this, and then the board ratified, which is something that Judge Whaley was stuck on in his dressing down of our case when he was ruling on the Rule 50 motion. Well, the board ratified it, they're the final policymaker, but the court did not look at, and certainly did not look at the facts that were in dispute in a light favorable to my client. Did you want to save the balance of the time? Yes, Your Honor, I forgot to, may I please have two minutes for rebuttal? Oh, yes. Okay, I'm, those are my points, thank you. Good morning. Sarah Allman for the County of Alpine. So first I'd like to address the issue of the character of the report. It was not a personnel review, it was considered an administrative review to review the events that led up to Ms. Noor's discovery that there were shortfalls and conflicting cost estimates with respect to a project called the Leviathan Project, a telecommunications project. She discovered that there were, there was a potential exposure to the County of Alpine, and I think you probably saw in the record, at least in Judge Mueller's order, it's a very small and populated, small populated county of fewer than 1,200 people. So it was a matter of great importance to the county, and it was significant to Ms. Noor because there was a potential that at least up to a $2 million shortfall could result. There was a $4.485 million contract that the county was obligated to, but there was only a gentleman's agreement, a loose commitment from CHP to pay the additional $2 million which it would take in order to fund the project. Did that report need to be made public? Was there another way to address the issues in that report without making it public, or at least all the references to the undershare? I don't think it would have been appropriate to keep it private. It was a matter of grave concern to the County of Alpine and the people who are living there. So the Brown Act required that it be, the information regarding the report be at least disclosed on the upcoming agenda so that people would have an opportunity to talk about something that was very significant to them. So no, but it was not directed at Mr. Levy. I don't think he was even mentioned in the report. It did say undersheriff, but it also listed a lot of other people and a lot of other issues. And the report did conclude that there was no wrongdoing, illegal wrongdoing or self-dealing, but it was an administrative review, not a personnel review. And I think it's really important to point out that there was a claim here, a POBRA claim, and that was dismissed. So there is nothing left in the case with respect to the propriety of a personnel investigation. That claim was dismissed by stipulation and order. The other point that counsel made was his contention that the ruling on the summary judgment was at odds with the court's order granting judgment after the plaintiff rested his case. So the summary judgment ruling did address the issue of adverse employment action. It did not address that issue with respect to the first claim for First Amendment retaliation, and that was because it was not raised in the papers. The only issue that was raised in the papers was with respect to the policymaking status of Ms. Knorr. But it takes me to the point that, yes, in a First Amendment retaliation claim, you do have to establish adverse employment action, and you have to do that with respect to the FEHA state law claims as well. And there was none in this case. So the Mulligan case, the Genie cases, those stand for the proposition that just scolding threats, words, things of that nature do not constitute any kind of adverse employment action. It takes more. There has to be some benefit that is affected. So here, Mr. Levy retired. He retired long after Ms. Knorr and Sheriff John Crawford retired. He retired with full benefits, with 83 percent of his salary as his pension. He stayed on several years after this. He was not demoted. I think the one thing that counsel referenced was that he was taken off his duties with respect to working on the telecommunications projects briefly. He was put back on in the beginning of 2013. That didn't involve any kind of loss of any tangible benefit to him. In fact, at one time previously, he had complained that was something he didn't want to do. But it didn't involve any pay or demotion or any kind of effect on his benefits, anything tangible. So all of the claims that were left in the case required adverse employment action, and there was none. If she was a final policymaker, then would a jury have to figure out if there was an adverse employment action, or is that purely a question of law? I think it's a separate requirement that there be an adverse employment action. It doesn't matter if she has the status of policymaker or not. But I don't think she did. And I think that's evident from the ordinance. The ordinance seems relatively clear that the county made the final decisions. Ms. Knorr probably was not the policymaker, at least from my read, but I guess if the evidence showed that the board was always approving everything Ms. Knorr recommended, could we conclude that the board was converting her by custom or delegation into a final policymaker? No, because I think there would have to be some kind of longstanding custom and policy with respect to Mr. Levy's alleged complaints of age discrimination, and there was no track record of that. And I think it was conceded by Mr. Levy in the district court that there was no ratification, there was no custom and policy. There was only this issue of whether or not Ms. Knorr was the final policymaker. And that's also what the appellate brief, the opening brief, recognizes as the primary issue along with adverse employment action. Those are the two issues that Mr. Levy raised on appeal. Those are the issues that we need to address. So, with respect to the policymaker status, the ordinance is what the court has to look at. It's based on state law, determines whether or not an individual is a policymaker. And I think that the case of Delia v. City of Rialto is on all squares, it's on point with this case, and it talks about a sheriff whose duties were specified in the ordinance. And he had the ability to make decisions and do work, but it wasn't policymaking. So the Supreme Court, you know, has recognized in St. Louis v. Petronic, if I may not be saying that properly, but that responding at superior has no place in a First Amendment retaliation claim. You have to determine who the final policymaker is by who makes the policy. And the fact that she was able to conduct investigations or do other work and had authority over certain employees or to make recommendations to the board, to propose options, did not convert her into a policymaker for First Amendment retaliation purposes. Are there any other questions? I don't have any. No. Thank you very much.  I'll keep my comments brief to the court. Starting at the end with this vote that the board took on the recommendation to approve the Liebert-Cassidy-Whitmore investigation, bear in mind, Your Honors, that this was done after, according to Chairman Veach, Ms. Knorr retained the firm, agreed to pay the firm, came to the board, and the board vote, even as Judge Whaley noted in his decision, was three to two. Those three were Sweeney, Jardine, and Bennett, the ones that opposed it, or pardon me, that were in favor of it. Those were original defendants in this case who were dismissed by this case as we got into it for lack of my client's ability to pay to prosecute those individual claims. It's important because it shows that there is a factual dispute. There was a factual dispute for Judge Whaley to look at in terms of giving Mr. Levy the benefit of the doubt, or at least looking at the evidence in a light more favorably to the plaintiff, the non-moving party, than the county. This idea that, if I may, the investigation did not name Mr. Levy personally, there's 19 references in the report to under Sheriff Levy. I think we have your argument well in hand. Thank you very much. Thank you. The case of Robert Levy v. County of Alpine is submitted. The last case on our docket, Sylvia Buchanan v. City of San Jose, has been submitted on the briefs, so that concludes our docket for this morning, and so we will be adjourned. Thank you. All rise.
judges: Tashima, Murguia, Chatigny